Exhibit H

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

ALEXANDRIA DIVISION

| | |
|---|---|
| Phillip Yun,<br>        Intervening Plaintiff,<br><br>v.<br><br>Natalie Lee,<br>        Plaintiff<br><br>v.<br><br>Michael (Soo Yeol) Kim,<br>        Defendant | Civil Action No. 1:14CV91<br><br><br>EXPERT REPORT AND DECLARATION OF<br>PAMELA S. CHESTEK |

**EXPERT REPORT AND DECLARATION OF PAMELA S. CHESTEK**

I, Pamela S. Chestek, submit this Declaration on behalf of Phillip Yun.

1.      I began studying trademark law while a law clerk and have been a practicing

lawyer in trademark law since my admission to the bar in 2001. My curriculum vitae is

attached as Exhibit A. I am Board Certified in Trademark Law by the North Carolina State

Bar's Board of Legal Specialization, one of only 22 individuals currently so certified in

North Carolina.

2.      I graduated *summa cum laude* from the Western New England College (now

University) School of Law, with a class rank of 1st out of 169 and a grade point average

of 93.4 of 99.

3.      I am admitted to practice and in good standing in Massachusetts (2001), New

York (2001), Connecticut (2001), the District of Columbia (2001) and North Carolina

(2010). I am also admitted to the Court of Appeals for the Federal Circuit and the District

Courts for the District of Massachusetts, the District of Connecticut, and the Southern

and Eastern Districts of New York.

4.      Before relocating to North Carolina in 2008, I was an adjunct professor teaching

Trademark Law and Unfair Competition at Western New England College School of Law.

5.      I have written a number of scholarly articles on trademark law, and more

specifically on trademark ownership. My articles have been cited in leading trademark

law and unfair competition treatises as well as by courts and administrative tribunals.

One in particular that is relevant to this dispute is an article entitled *Who Owns the

Mark? A Single Framework for Resolving Trademark Ownership Disputes*, 96 Trademark

Rep. 681 (2006). The article has been cited in *Lunatrex, LLC v. Cafasso*, 674 F.Supp.2d

1060, 1073 (S.D. Ind. 2009) (common law partnership), *C.F.M. Distributing Co. v.

Costatine*, 2013 WL 3188898 (Trademark Tr. & App. Bd. Mar. 20, 2013)

(nonprecedential) (multiple restaurants); *Rosa v. Vargas*, Opp. No. 91205076,

(Trademark Tr. & App. Bd. June 27, 2014) (nonprecedential) (band name); 2 J. Thomas

McCarthy, *McCarthy on Trademarks and Unfair Competition* § 16:35 (4th ed. 2014); 3

Louis Altman & Malla Pollack, *Callmann on Unfair Competition, Trademarks &

Monopolies* § 20:19 (4th ed. 2014); 1 William Holmes, *Intellectual Property and Antitrust

Law* § 3:2 (2014), and Graeme B. Dinwoodie & Mark D. Janis, *Trademark Law and

Theory: A Handbook of Contemporary Research* 49, 115 (2008). The article is attached as

Exhibit I.

6.      For the past five years I have been the sole author of a blog called "Property, Intangible," published at www.propertyintangible.com. The blog subject matter is the ownership and licensing of all types of intellectual property, namely, trademark, copyright, patent, trade secret and domain names. In general, I write about current decisional law. To date, I have published 537 posts and 270 of those posts are tagged "trademark." That is an average of about one post a week on ownership of trademarks. Because of my blog I have been called an "ownership guru," "IP ownership maven" and a "real IP lawyer." Exh. J.

7.      I write about the acquisition, transfer, and loss of trademark rights. The topics I write about include the inception of rights, concurrent and joint use, trademark priority, assignment, chain of title, and licensing. Writing about these topics means that I am very familiar with the substantive areas of contract law and business organizations in addition to trademark law, and I frequently write on cases involving employment law, bankruptcy law, trusts and estates, property law and family law.

8.      I am a frequent speaker on intellectual property ownership. For example in November, 2014, I am scheduled to give a talk entitled "How to Identify and Manage Intellectual Property Rights in Bankruptcy" to the North Carolina Bankruptcy Institute.

9.      As far as I know, I am the only attorney who specializes in the law of ownership of intellectual property.

10.      I have worked both at law firms and as an in house attorney. My experience as an in house attorney in particular often involved trademark ownership issues, both in the context of transactions as well as making a decision about trademark ownership in

3

ambiguous situations. I have often looked at a wide variety of evidence of different types and reached a conclusion about who I believed to be the owner of a trademark, making critical business decisions based on the conclusion I reached.

11.     I have never testified as an expert at trial or by deposition.

12.     I am being paid at a rate of $250 per hour for my study and testimony in this case.

**Statement of Opinion**

13.     I have been asked to prepare a report advising this Court of my views, based on my experience as a practicing trademark lawyer and scholar of trademark law, with respect the ownership of the trademark CAFÉ PHILLIPS for restaurant services (the "Mark") as between Plaintiff Jennifer Lee ("Ms. Lee") and Intervening Plaintiff Phillip Yun ("Mr. Yun").

14.     The materials I consulted and upon which I rely are either cited in this report or listed in Exhibit H, all of which are annexed hereto. This report reflects work completed through today. I reserve the right to supplement this report should additional relevant information come to my attention.

15.     In summary, it is my opinion, for the reasons that will be discussed in detail below, Phillip Yun is the owner of the Mark, subject to an agreement not to interfere with Ms. Lee's use of the Mark at a single restaurant located at 50 "F" Street NW, Washington, District of Columbia 20001.

Case Background

16.     I understand the below listed facts to be true and accurate.

4

17.     Ms. Lee and Mr. Yun were married in September, 1991 and divorced sometime in October, 2009.

18.     During the term of their marriage, five CAFÉ PHILLIPS restaurants were opened. Exh. B, ¶ 3.

19.     The parties entered into a Marital Settlement Agreement ("MSA") on September 15, 2008, Exh. C, which was incorporated into, but not merged with, the Divorce a vincul matrimonii. Paragraph 5 of the MSA states that "the incorporation of this Agreement into an order or decree shall not be a substitute for the contractual obligations hereunder and that the terms and provisions of this Agreement shall be effective and independent of such order or decree and shall not be merged therein."

20.     The MSA was amended on or around November 6, 2009 (the "Amendment"). Exh. D.

21.     In the MSA, Ms. Lee "receive[d] as her separate property NGSC, LLC which is the entity which owns a restaurant known as CAFÉ PHILLIPS, located at 50 'F' Street NW, Washington, District of Columbia 20001." Further details about the agreed upon terms will be discussed in context below.

22.     In the MSA Mr. Yun "retain[ed] as his separate property all other interest he may have in any other CAFÉ PHILLIPS restaurant(s), wherever located, and whatever such interest(s) may be."

23.     Mr. Yun opened additional restaurants after the parties entered into the MSA.

24.     Ms. Lee filed a trademark application on November 4, 2011 for CAFÉ PHILLIPS in

stylized form and was granted U.S. Reg. No. 4,493,256 for "deli, cafe, and catering

services" on March 11, 2014. Exh. E.

Application of the Law In This Case

25.     Business people are best-suited to decide whether their self-interest is better

served by making contracts. *T & T Mfg. Co. v. A.T. Cross Co.*, 449 F. Supp. 813, 827

(D.R.I.), *aff'd*, 587 F.2d 533 (1st Cir. 1978), *cert. denied*, 441 U.S. 908, 99 S. Ct. 2000, 60

L. Ed. 2d 377 (1979). Therefore, courts give deference to the parties' intentions as

expressed in a private agreement. *Id.*

26.     Courts have applied somewhat different standards when deciding whether to

enforce a contact involving a trademark. In the strictest cases, a court will honor the

parties' agreement without considering any other factors. *E. F. Prichard Co. v.*

*Consumers Brewing Co.*, 136 F.2d 512, 522 (6th Cir. 1943), *cert. denied,* 321 U.S. 763, 64

S. Ct. 486, 88 L. Ed. 1060 (1944) ("As between parties claiming the right to a trade-mark,

… the party who has agreed that the other shall be the owner of the trade-mark, is

estopped from raising questions with regard to adoption and use; and the inquiry is

limited to determining whether the terms of the contract have been violated"); *TMT*

*North America, Inc. v. Magic Touch, GmbH*, 124 F.3d 876, 884 n.4 (7th Cir. 1997) (where

ownership was established by agreement, the trademark owner could lose rights by

assignment or abandonment, but not by a nebulous balancing test); *cf. Doeblers'*

*Pennsylvania Hybrids, Inc. v. Doebler*, 442 F.3d 812, 826 (3d Cir. 2006) (rejecting

evaluating consumer expectations about ownership when initial ownership has been

established and there has not been any assignment). A less strict view is to honor the

parties' private agreement except where it is against public policy. *T & T Mfg. Co.,* 449 F.

Supp. at 827 (stating that contracts are to be enforced except when against public

policy, and enforcing an agreement that allowed for the parties' marks to coexist even

though there would be confusion); *Times Mirror Magazines, Inc. v. Field & Stream*

*Licenses Co.*, 294 F.3d 383, 396 (2d Cir. 2002) (stating that settlement agreements in

trademark cases may be set aside only if the public interest would be significantly

injured if the contract is allowed to stand); *DC Comics v. Kryptonite Corp.*, 336 F. Supp.

2d 324, 333 (S.D.N.Y. 2004) (same); *Kegan v. Apple Computer, Inc.*, 95 C 1339, 1996 WL

667808 (N.D. Ill. Nov. 15, 1996) (collecting cases); *see also Visa Int'l Serv. Ass'n v.*

*Bankcard Holders of Am.*, 784 F.2d 1472, 1474 (9th Cir. 1986) (remanding case to take

additional discovery on public injury when product was credit card insurance).

27.     On September 15, 2008, the parties entered into an agreement, the MSA, in

which the parties privately agreed to ownership terms for the CAFÉ PHILLIPS mark.

Although the word "trademark" or "trade name" is not mentioned expressly, the MSA

nevertheless is reasonably clear on ownership of the trademark.

28.     First, we are all familiar with franchise restaurant businesses, which demonstrate

the principle that a restaurant name and the physical location of the restaurant are

separate assets. Therefore, the disposal of a physical location is not automatically a

disposition of the name of the restaurant. *See, e.g.*, *Lingo v. Lingo*, 785 F. Supp. 2d 443,

451 (D. Del. 2011) (concluding that the name of the store was a separate asset from the

premises and not conveyed in a partition sale of the premises).

29.     Ms. Lee acknowledged in her Declaration in this case that, prior to entering into the MSA, she was aware that the CAFÉ PHILLIPS name was separable from the restaurants with which it was used. Exh. B, ¶ 27 ("In or around December 16, 2006, Yun and I sold the CAFE PHILLIPS restaurant at the 1201 Pennsylvania Avenue Location .... However, Yun and I retained ownership of the CAFE PHILLIPS trademark.").

30.     In this case, the MSA awarded to Ms. Lee a company, NGSC, LLC, which operated a restaurant business under the name CAFÉ PHILLIPS at a specific location, 50 F Street NW. The language in this paragraph contemplated that Ms. Lee was gaining ownership of the restaurant business – "shall receive … the entity which owns a restaurant" – and is silent about the name.

31.     Contrary to the carefully defined scope of the rights Ms. Lee obtained, the paragraph describing Mr. Yun's interest in the restaurant business, to wit "all other interests he may have in any other CAFÉ PHILLIPS restaurant(s) … whatever such interests may be," describes the entire universe of any kind of right of any kind associated with the restaurants, which would include the Mark.

32.     Since there were five restaurants operating under the CAFÉ PHILLIPS mark at the time the parties entering into the MSA, it is not a reasonable interpretation of the MSA that somehow the transfer of business operations at a single location would transfer a trademark used at multiple locales.

33.     The specific word choice used in the division of property in Paragraph 22 of the MSA confirms that the Mark was not transferred by operation of the MSA. Specifically, Paragraph 22(a)(1) says that "Wife shall receive" the restaurant but in contrast,

Paragraph 22(b) says "Husband shall retain" all other interests. The use of the words "retain" and "receive" suggest that the parties understood that Mr. Yun was the original owner of all the assets but Ms. Lee was given one restaurant in settlement.

34.      No other terms of the MSA alter this conclusion. Paragraph 22(a)(3), a paragraph that would have imposed a royalty obligation on Ms. Lee, is crossed out. However, in the context of a divorce settlement, which is a type of document that generally contains financial obligations of many kinds, the most reasonable interpretation of the agreement is that this paragraph was stricken because of the financial burden, not *sub silentio* any reflection on a change in ownership of the Mark.

35.      The Amendment to the MSA did not affect the provisions regarding ownership of the Mark. First, Paragraph 3 of the Amendment assigns to Ms. Lee "all future payments from Rachel's Place Corporation to husband as consideration for husband's licensing of the trade name 'Café Phillips' for use at the corporation's place of business at 650 Massachusetts Avenue, N.W., Washington, D.C. 20001." But its express terms, this is an assignment of an income stream, not the Mark. Further, it ratifies Mr. Yun's ownership of the Mark, that is, the payments from Rachel's Place Corporation to Mr. Yun were in consideration of "*husband's*" licensing of the Mark to Rachel's Place Corporation. This is an express acknowledgement that Mr. Yun owns the CAFÉ PHILLIPS mark. Finally, if this paragraph was some kind of assignment of Rachel's Place Corporation's rights in the Mark, then the underlying licensing agreement between Mr. Yun and Rachel's Place Corporation would have been assigned too, and it was not.

36.     Paragraph 4 of the Amendment adds a new Paragraph 22(a)(5) to the MSA which

provided that Ms. Lee would have "free and clear, simple title and enjoy quiet and

exclusive ownership" of the F Street restaurant and that she could sell the restaurant

and "collect any royalties or license fees from any such transferee, buyer, assignee or

receiver of ownership rights without any interference from Husband and without any

accounting and without any payment or other obligation of any kind to Husband." This

paragraph is consistent with Ms. Lee's ownership of the restaurant business without an

ownership interest in the Mark. That is, "free and clear, simple title" and "quiet and

exclusive ownership" allowed her to transfer her interest in the real property without

any obligation to Mr. Yun. If she sold the restaurant she could collect royalties and

license fees, but the language clearly states that this right was for the F Street locale

only: the paragraph defined the involved property as the F Street location, which she

could sell and collect income from any "*such*" transaction. This language does not in any

way suggest that Ms. Lee could use the CAFÉ PHILLIPS trademark at any other locations

or that she had any ownership interest in the Mark.

37.     The fact that Ms. Lee was permitted the continued use of the Mark for her locale

without any requirement that her restaurant remain consistent with the other CAFÉ

PHILLIPS restaurants is not particularly good trademark practice, but it is a reasonable

business solution for a problem. *See*, *e.g.*, *Times Mirror Magazines, Inc. v. Field & Stream

Licenses Co.*, 103 F. Supp. 2d 711, 740 (S.D.N.Y. 2000) *aff'd*, 294 F.3d 383 (2d Cir. 2002)

(enforcing a number of contracts that allowed for the possibility of confusion); *T & T*

*Mfg. Co.*, 449 F. Supp. at 827 (enforcing a contract where the plaintiff voluntarily settled a case in a way that allowed for the possibility of confusion).

38.     To summarize, before the parties entered into the MSA there was a Mark, CAFÉ PHILLIPS, that was used at five locations and therefore existed independently from the F Street location. The Mark was retained by Mr. Yun in the original MSA and the Amendment to the MSA is consistent with, and confirms, Mr. Yun's ownership of the Mark.

39.     Enforcing this agreement is also not against public interest. There is only minimal injury to the public when there are similar restaurant names, which does not outweigh holding parties to their contractual commitments. *Proriver, Inc. v. Red River Grill, LLC*, 83 F. Supp.2d 42, 46 (D.D.C. 1999).

40.     There are some cases where courts will give weight to the contract but also consider consumer perception. *Premier Dental Prods. Co. v. Darby Dental Supply Co.*, 794 F.2d 850, 854 (3rd Cir. 1986) (stating "While the parties' agreement is important in settling the question of ownership, it is not dispositive. The ownership of the product's goodwill must also be determined. 'The intent of the parties to create ... a perception [that a particular firm is the legal entity standing behind the mark] ... is not conclusive evidence of what the public actually did perceive but is circumstantial proof, absent evidence to the contrary, that what the parties intended to be the public perception was, in fact, their actual perception.' " (ellipses and brackets in original)); *Country Fare LLC v. Lucerne Farms*, 2011 WL 2222315, at *7-8 (D. Conn. June 7, 2011) (finding that the plaintiff's trademark ownership was "clearly delineated in the parties' 1999 agreement"

11

but considering consumer perception); 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 16:48 (4th ed. 2014) (discussing balancing the policy factors of contractual expectation and consumer perception when deciding trademark ownership in a manufacturer-distributor relationship).

41.     Factors courts commonly look at when evaluating consumer perception are (1) which party invented and first affixed the mark onto the product; (2) which party's name appeared with the trademark; (3) which party maintained the quality and uniformity of the product; and (4) with which party the public identified the product and to whom purchasers made complaints. *Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1220 (9th Cir. 1996).

42.     Without belaboring the point, the consumer perception in this case is clearly that Mr. Yun is the owner of the Mark. Attached at Exhibit F are a number of news articles describing Mr. Yun's business that identify him, and only him, as associated with the mark. For example, one article refers to Mr. Yun as the " titular owner" and two entire articles are dedicated to Mr. Yun as the person behind the many locations of CAFÉ PHILLIPS restaurants. The only reference to Ms. Lee is not any association with the restaurant business, but rather a statement that her paintings were on exhibit in the F Street location. Mr. Yun licenses the Mark to several restaurants and ensures that they standardize on the same level of quality. Exh. G. Thus, even if the Court were to take consumer perception into account, Mr. Yun is clearly perceived as the owner of the CAFÉ PHILLIPS mark.

Evidentiary Effect of Trademark Registration

43.     Finally, I note that Ms. Lee has registered the CAFÉ PHILLIPS mark with the

Patent and Trademark Office, with a registration date of March 11, 2014. A trademark

registration is prima facie evidence of ownership of the mark. Trademark Act, § 33(a), 15

U.S.C. § 1115(a) (2012).

44.     It is my opinion that, as described above, Mr. Yun owns the CAFÉ PHILLIPS mark,

therefore rebutting the prima facie evidence of the registration. As such, the

registration was void *ab initio* since only the owner of a trademark may file an

application. Trademark Act, § 1, 15 U.S.C. § 1051 (2012). The registration should

therefore be cancelled.

45.     It is also my opinion that, even if Ms. Lee had a good faith belief that she owned

the CAFÉ PHILLIPS mark for the F Street location, that ownership would not entitle her

to federal registration. Ms. Lee stated in her application, as all trademark applicants

must, that "to the best of his/her knowledge and belief no other person, firm,

corporation or association has the right to use the mark in commerce." Ms. Lee was

aware that there were a number of other CAFÉ PHILLIPS establishments using the mark

in identical form that were not under her control when she filed her application in

November, 2011. Some courts have found a misrepresentation of this kind to be

fraudulent. *See, e.g.*, *Angel Flight of Georgia, Inc. v. Angel Flight Am., Inc.*, 522 F.3d

1200, 1211 (11th Cir. 2008) (finding no error that it was fraudulent for the applicant to

represent that, to "the best of his knowledge and belief no other person, firm,

13

corporation, or association ha[d] the right to use" the mark, when in fact the applicant had knowledge that there were others with an equal right to use the mark).

<u>Conclusion</u>

46.      As stated at the outset, it is my opinion that Mr. Yun currently owns the CAFÉ PHILLIPS trademark. Ms. Lee may use the trademark at a single location, 50 F Street, NW, Washington, D.C. 20001, without interference from Mr. Yun and she may sell the location to a successor who would also be permitted to use the CAFÉ PHILLIPS mark without interference from Mr. Yun. However, Ms. Lee has no right to license the mark to others for use at other locations or to obtain a federal registration for the Mark.

Date: July 9, 2014

Pamela S. Chestek

14

<u>List of Exhibits</u>

Exhibit A – Curriculum Vitae for Pamela S. Chestek

Exhibit B –Declaration of Natalie Lee

Exhibit C – Marital Separation Agreement

Exhibit D – Amendment to Marital Separation Agreement

Exhibit E – File history for U.S. Reg. No. 4,493,256

Exhibit F – webpage printouts

Exhibit G – Various trademark licenses

Exhibit H – List of documents consulted or relied upon

Exhibit I – Pamela S. Chestek, *Who Owns the Mark? A Single Framework for Resolving Trademark Ownership Disputes*, 96 Trademark Rep. 681 (2006)

Exhibit J – various web printouts

# Exhibit A

# PAMELA S. CHESTEK

## Chestek PLLC

PO Box 2492
Raleigh, North Carolina 27602
(919) 800-8033
pamela@chesteklegal.com

### LEGAL EXPERIENCE

2012 – present: **Chestek PLLC**, Raleigh, North Carolina
    Principal

2008 – 2012: **Red Hat, Inc.**, Raleigh, North Carolina
    Manager, Senior IP Attorney

2007 – 2008: **Progress Software Corporation**, Bedford, Massachusetts
    Senior Counsel, Intellectual Property

2004 – 2008: **Western New England College School of Law**, Springfield, Massachusetts
    Adjunct Professor

2005 – 2007: **Reebok International Ltd.**, Canton, Massachusetts
    Intellectual Property Counsel

2004 – 2005: **Bulkley, Richardson and Gelinas, LLP**, Springfield, Massachusetts
    Associate

2001 – 2004: **Cantor Colburn LLP**, Bloomfield, Connecticut
    Associate

1997 – 2001: **Cantor Colburn LLP**, Bloomfield, Connecticut
    Law Clerk

### PUBLICATIONS

*Property, Intangible,* www.propertyintangible.com (2008 – ), in excess of 500 posts.

*Allowing Third-Party Use of Marks Without Risking Abandonment,* North Carolina Bar Association 2014 IP Section Annual Meeting (2014) (presentation and paper).

*Who Owns the Open Source Project Name?*, 103 Trademark Rep. 1240 (2013).

*Who Owns the Project Name?,* International Free and Open Source Software Law Review, 5(2), pp 105 – 120, DOI: 10.5033/ifosslr.v5i2.87.

*The Uneasy Role of Trade Marks in Free and Open Source Software: You Can Share My Code But You Can't Share My Brand*, 7 J. Intell. Prop. Law & Prac. 126 (2012).

*Who Owns the Intellectual Property?*, North Carolina Bar Association 2012 IP Section Annual Meeting (2012) (presentation and paper).

## Pamela S. Chestek – page 2

*Who Owns the Mark? A Single Framework for Resolving Trademark Ownership Disputes*, 96 Trademark Rep. 681 (2006), cited in 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 16:35 (4th ed. 2014); 1 William Holmes, *Intellectual Property and Antitrust Law* § 3:2 (2014); 3 Louis Altman & Malla Pollack, *Callmann on Unfair Competition, Trademarks, & Monopolies,* § 20:19, n.6.60 (4th ed. 2007)

*Control of Trademarks by the Intellectual Property Holding Company,* 41 IDEA 1 (2001), cited in 2 J. Joseph McCarthy*, McCarthy on Trademarks and Unfair Competition*, § 18:51, n.20 (4th ed. 2014)

## EDUCATION

*Western New England College School of Law*, Springfield, Massachusetts
Juris Doctor, May, 2000, awarded *summa cum laude*
Class Rank: 1/169   GPA:  93.4 of 99
*Western New England Law Review*, Junior Staff 1998-1999

*Pennsylvania State University*, University Park, Pennsylvania
Bachelor of Fine Arts in Technical Theatre and Lighting Design, awarded with High Distinction

## BAR ADMISSIONS

*State*: Massachusetts; New York; Connecticut; District of Columbia; North Carolina. Board Certified by the North Carolina State Bar's Board of Legal Specialization in Trademark Law.

*Federal*:  Court of Appeals for the Federal Circuit; District Courts for the District of Massachusetts, the District of Connecticut, and the Southern and Eastern Districts of New York